IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| U.S. AGRISOIL, LLC and THE ENVIRONMENTAL DEVELOPERS GROUP, LLC, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C.A. No.  1:20-cv-02454 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| SHAWN KRELOFF, BTS BIOENERGY, LLC, BIOENERGY DEVELOPMENT GROUP, LLC, BIOENERGY DEVCO, LLC, BTS BIOGAS, LLC, NEWLIGHT PARTNERS LP and SAGEWIND CAPITAL LLC, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

Plaintiffs U.S. Agrisoil, LLC ("USAG") and The Environmental Developers Group, LLC ("EDG") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Shawn Kreloff ("Kreloff"), BTS Bioenergy, LLC ("BTS"), Bioenergy Development Group, LLC ("BDG"), Bioenergy Devco, LLC ("Bioenergy Devco"), BTS Biogas, LLC ("BTS Biogas"), Newlight Partners LP ("Newlight") and Sagewind Capital LLC ("Sagewind") (collectively, "Defendants").  In support of their Complaint, Plaintiffs allege the following:

### **Nature of the Action**

1.     Not having any prior relationships, contacts or expertise in the Delmarva Peninsula's poultry industry, Defendants sought Plaintiffs out.  With the promise of mutual revenue sharing and other compensation, both Plaintiffs and Defendants worked together to develop a profitable composting and anaerobic digestion enterprise spanning several separate projects.  Unbeknownst to Plaintiffs at the time, Defendants hedged their promises and contractual

commitments through the use of false statements and shell entities that were never separately operated nor maintained.  Once the venture capital Defendants understood what was at stake, all the Defendants worked to rid themselves of the compensation and revenue override Plaintiffs were owed.  When Defendants thought they had exhausted Plaintiffs' usefulness, they discarded Plaintiffs after almost two years of working hand-in-hand.  Rather than honor the terms of their agreement or the promises made, Defendants took for themselves a multi-million dollar relationship that will last decades into the future.  Through this proceeding, Plaintiffs seek compensation for Defendants' improper and unlawful conduct.

<u>**Parties**</u>

2.      USAG is a limited liability company organized and existing under the laws of the State of Delaware.  USAG's member is a citizen of the State of Delaware.

3.      EDG is a limited liability company organized and existing under the laws of the State of Rhode Island.  EDG's members are citizens of the State of Rhode Island.

4.      Upon information and belief, Kreloff is a citizen of either the State of Connecticut, the State of Maryland or the State of New York.  Kreloff is a principal of and part (if not entire) owner of the various bioenergy/biogas entity defendants to this litigation.

5.      BTS is a limited liability company that was organized and existed under the laws of the State of Maryland.  BTS was never registered to do business in Delaware.  In May 2019, Kreloff directed that BTS be dissolved a mere three days after he improperly believed BTS was freed from its contractual obligations to Plaintiffs.  The attempted dissolution was improper and an unlawful effort to defraud Plaintiffs of amounts owed to them.  Kreloff was the BTS member designated to windup BTS' affairs.

6.     BDG is a limited liability company organized and existing under the laws of the State of Delaware – first being formed on October 8, 2018.  In its registration with the Maryland Secretary of State, BDG represented that it had not done business in Maryland prior to April 9, 2019.  As of the date of this filing, BDG is not a business in good standing in Maryland because it failed to file an annual report.

7.     Bioenergy Devco is a limited liability company organized and existing under the laws of the State of Delaware – first being formed on October 8, 2018.  In its registration with the Maryland Secretary of State, Bioenergy Devco represented that it had not done business in Maryland prior to June 12, 2020.

8.     BTS Biogas is a limited liability company organized and existing under the laws of the State of Maryland – first being registered in November 2017.  It is the United States company for BTS Biogas SRL/GMBH – a company organized and existing under the laws of Italy.  In its registration with the Maryland Secretary of State, BTS Biogas represented that it had not done business in Maryland prior to November 20, 2017.  As of the date of this filing, BTS Biogas is not a business in good standing in Maryland because it failed to file an annual report.

9.     Newlight is a limited partnership organized and existing under the laws of the State of Delaware.

10.     Sagewind is a limited liability company organized and existing under the laws of the State of Delaware.

11.     Upon information and belief, the members and partners of the entity defendants are not citizens of either Delaware or Rhode Island.

**Jurisdiction and Venue**

12.     Pursuant to 28 U.S.C. § 1332, jurisdiction is proper in this Court because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

13.     Pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**Facts**

**A.     Plaintiff's Years of Experience and Contacts within the Industry**

14.     Charlie Gifford ("Gifford") is a principal for EDG, and Gifford and EDG are agents for USAG.  Gifford is a trusted veteran in the waste composting industry.  Beginning in 1995, Gifford spearheaded the creation of a cutting-edge recycling and composting facility in Nantucket, Massachusetts.  The Nantucket facility was one of the first facilities to compost organic waste on a large scale.

15.     In 1997, Gifford's son Chuck joined him at the Nantucket facility, learning the processes and operations of a cutting-edge, highly efficient waste composting facility.

16.     In 2010, Gifford started to lend his expertise to a start-up composting facility in Wilmington, Delaware.  The Wilmington composting facility was designed and permitted to handle a large-scale organic composting capacity.

**B.     Plaintiffs Develop a Profitable Relationship with Perdue**

17.     In 2010, while working at the Wilmington composting facility, Gifford first met Randy Day.  At that time, Day was the Senior Vice President in charge of business development for Perdue AgriBusiness, Inc.  Since that time, Day has been very successful and is currently Perdue Farm's Chief Executive Officer.

18.     Day was working to further Perdue's commitment to environmentally sustainable methods of waste disposal from its facilities.  Through that effort, he naturally gravitated toward Gifford when they first met at the Wilmington facility.

19.     Because the Wilmington facility was still working to become fully operational at the time, and because it would use some of the same equipment and processes that Gifford helped create in Nantucket, both Day and Gifford agreed to tour the organic composting capabilities already underway in Nantucket.

20.     Day liked what he saw in Nantucket and both he and Gifford agreed that there was a viable model for composting organic waste from Perdue's operations.  Composting provided an environmentally sustainable alternative (albeit more expensive) to other methods Perdue used to handle organic waste from its facilities.

21.     Thereafter, Perdue and Day set about to issue a Request for Proposal in 2011 to develop, build and operate an organic composting facility that would meet Perdue's specific needs.

22.     Gifford worked with the Wilmington facility to submit a proposal to Perdue.

23.     Based in large part on Gifford's expertise, the Wilmington facility was awarded the opportunity to develop, build and operate an organic composting facility for Perdue.

24.     At about the same time, the Wilmington facility underwent some organizational changes.  Gifford's other partners wanted to focus on organic wastes, including restaurants, supermarkets and other large-scale food producers, while Gifford saw the opportunities presented by single stream agricultural organic waste recycling.

25.     As a result, Gifford was able to separate from his partners in the Wilmington facility and in exchange was given the exclusive right to pursue the development, construction and operations of organic composting facilities for Perdue.

26.     Beginning in 2012 and continuing for several years, Gifford and USAG worked with Perdue to develop and build an organic composting facility in Seaford, Delaware.

27.     In 2016, Day directed that the Seaford facility be constructed and that USAG (and its affiliate) would oversee its construction and manage the facility's operations once completed. USAG (through its affiliate) owned a 30% interest in the Seaford facility.[1]

28.     Once the Seaford facility was operational in December 2016, USAG received a $50,000 per month fee to manage the Seaford facility.  From that time until early 2020, Gifford, his son Chuck and his son-in-law Jason Pease were actively involved in the management, operation and product sales of the Seaford facility.  In addition to being a partner, Perdue was Plaintiffs' customer.

29.     Over their ten years of working together, Day came to trust and rely upon Gifford for his knowledge and expertise in organic composting and the Gifford family's experience with building and managing large-scale organic composting facilities.

**C.**     **Kreloff is Introduced to Gifford as the Person who has Connections with Perdue**

30.     Kreloff described himself as having "a 30-year history of successful entrepreneurial ventures and investments" and having "participated in the founding, operating, financing and advisory of over 25 different companies."   https://bioenergydevco.com/leadership-team/ (last visited August 18, 2020).

31.     Kreloff advertised that his "investment thesis for [Bioenergy Devco] is to marry BTS's [BTS Biogas from Italy] proven anaerobic digestion technology with plant financing,

---

[1] On or about January 27, 2017, Perdue (through its affiliate) purchased the USAG affiliate's 30% interest in the Seaford facility, and the USAG affiliate retained certain rights to payments based on product sales.

engineering, project development, and to guarantee energy yields and plant performance. The last part of the thesis is to bring this solution to the United States and the rest of the world." *Id.*

32.     The first hurdle for Kreloff and his investment thesis was getting to know the right people.  Kreloff first engaged Nelson Widell as a consultant to identify potential opportunities.

33.     Widell had worked with Gifford at the Wilmington facility and knew of Gifford's successful relationship with Perdue and Day.   As a result, Widell first introduced Kreloff to Gifford.

34.     On March 5, 2018, Gifford, Kreloff and Widell had their first call to discuss how Kreloff and his companies could work with Gifford. Interested in establishing anaerobic digestion operations in the United States, Kreloff worked with Gifford to leverage the relationships Gifford had with Perdue and other poultry companies.

35.     Before this time, Kreloff had no prior contacts or relationships with either Perdue or Day.

36.     On May 3, 2018, Gifford, Chuck Gifford, Kreloff and Widell met in person in Georgetown, Delaware to discuss Gifford's work with Perdue and how the relationship between Kreloff and his companies would work with Gifford and the companies with which he was involved.

37.     During a follow-up call on May 9, 2018, Gifford and Kreloff further discussed a potential consulting agreement between the two parties and that Perdue's Accomac, Virginia facility was a prime target for application of anaerobic digestion technology.

**D.     Defendants Contract with Plaintiffs to Mutually Profit from Plaintiffs' Industry Experience and Contacts**

38.     At the same time Kreloff and Gifford were framing the expectations of their relationship moving forward, Kreloff had his attorney, Aaron Greenfield, draft a Consulting Agreement.

39.     While effective as of May 1, 2018, Kreloff and Gifford executed the Consulting Agreement on May 31, 2018.

40.     The company Kreloff chose to shoulder his obligations under the Consulting Agreement was BTS.

41.     While the Consulting Agreement was effective as of May 1, 2018, Greenfield had not formed BTS until May 22, 2018.

42.     While backdating a contract to a time when the contracting company did not exist is troubling, Plaintiffs later discovered that Kreloff engaged in a pattern of unlawful corporate structuring in an effort to defraud them.

43.     Kreloff previously incorporated Gotham Heavy Industries, Inc. in Delaware on January 19, 2016 and registered it as a corporation in Maryland on November 15, 2016.  Thereafter, Gotham registered BTS Bioenergy, Inc. (not BTS Bioenergy, LLC) as a tradename in Maryland on September 14, 2017.

44.     If Kreloff intended to act in good faith toward Plaintiffs, he could have utilized either Gotham, BTS Bioenergy, Inc. (versus BTS Bioenergy, LLC) or BTS Biogas as the contracting party to the Consulting Agreement.  Instead, Kreloff (through the use of his legal counsel) purposefully chose to create and use BTS as the shell contracting party. Upon information and belief, Kreloff failed to observe corporate formalities for BTS – BTS did not have an operating agreement, bank account or operations separate from Kreloff or his other companies.

45.     Despite manifest representations to the contrary, Kreloff never intended to honor BTS' obligations under the Consulting Agreement.

46.     Notwithstanding this fraud, the express terms of the Consulting Agreement are clear.  BTS' successors and assigns are liable for the compensation owed Plaintiffs.

47.     The Consulting Agreement identifies that EDG was BTS' "exclusive business development provider for Perdue Farms within the United States and all other poultry companies located on the Delmarva Peninsula . . . ."  (Exhibit A at ¶ 1(c)).

48.     In addition, the parties agreed that EDG "will serve as [BTS'] sole provider for anaerobic digestion for Perdue Farms and for all poultry companies located in the Delmarva Peninsula."  (*Id.*).  Through this provision, Kreloff and BTS locked-up Gifford and EDG from working with anyone else.

49.     The initial period of performance under the Consulting Agreement was May 1, 2018 through April 30, 2019.

50.     As payment for the services rendered, BTS agreed to three separate fees.  First was a Monthly Fee of $6,000 that was to be paid each month from May 2018 through at least October 2018.  (Exhibit A at ¶ 6(a)).  The Monthly Fee could be continued upon the parties' written agreement.

51.     BTS never paid the Monthly Fee.  Instead, the fee was initially paid by Virtual Equity Partners LLC – an investment company affiliated with Kreloff.  Thereafter, the Monthly Fee was paid by BDG.  In hindsight, this is further evidence of Kreloff employing BTS as a shell company.

52.     The next fee payable under the Consulting Agreement was a Developer Fee.  BTS agreed to pay EDG two percent (2%) of BTS' expended capital costs for projects it constructed on

property secured by EDG and provided by Perdue Farms in the United States or another poultry company on the Delmarva Peninsula.  (Exhibit A at ¶ 6(b)).  This fee was payable even after any termination of the Consulting Agreement if the Parties agreed in writing that EDG's efforts resulted in the given project.

53.    The last fee payable under the Consulting Agreement was a Tipping Fee.  BTS agreed that it would pay EDG the following:

> [T]wo dollars ($2) per ton for every ton of organic waste collected and delivered by Perdue Farms in the United States or all other poultry companies located on the Delmarva Peninsula to [BTS'] facilities.  In addition, based upon a standard tipping fee of fifty five dollars ($55) per ton, [BTS] will pay [EDG] twenty five percent (25%) of any tipping fee it can secure over and above the standard tipping fee of fifty five dollars ($55) per ton.

(Exhibit A at ¶ 6(c)).  This fee was payable even after any termination of the Consulting Agreement if the Parties agreed in writing that EDG's efforts resulted in the given project.

54.    In order to protect the value of the relationships it had with Perdue, EDG insisted on the non-circumvention and non-solicitation provisions contained in the Consulting Agreement.

55.    Specifically, BTS agreed and warranted that neither it nor its affiliates would circumvent or attempt to circumvent EDG's relationship and contacts with Perdue.  (Exhibit A at ¶ 11).

56.    BTS also agreed that for a period of twelve (12) months after any termination of the Consulting Agreement it would not "directly or indirectly, solicit or attempt to solicit any business from any of the other Party's Customers, Customer Prospects or Vendors with whom either Party had Material Contact during the term of this Agreement."  (Exhibit A at ¶ 12).

57.    In order to protect against business entity gamesmanship, the parties expressly agreed that the Consulting Agreement "shall inure to the benefit of, and be binding upon, the Parties and their respective successors and assigns, whether or not any such person shall have

become a Party to this Agreement and have agreed in writing to join herein and be bound by the terms and conditions hereof." (Exhibit A at ¶ 13) (emphasis added).

58.   BDG[2] and Bioenergy Devco are BTS successors or assigns.

59.   If the successor and assign language was not determinative (which it is), EDG had the added comfort of BTS agreeing not to make use of any affiliate or third-party to circumvent EDG's relationships and contacts. (Exhibit A at ¶ 11). BDG and/or Bioenergy Devco are BTS' affiliates or responsible third-parties.

60.   Pursuant to the Consulting Agreement's indemnification provision, EDG is entitled to recover all its losses given a material breach of the representations, warranties, covenants or agreements set forth in the Consulting Agreement.

**E.     Plaintiffs' Work Under the Consulting Agreement**

61.   Relying on the Consulting Agreement and its belief that BTS and Kreloff would work in good faith, Plaintiffs immediately set about to further Defendants' interests with Perdue.

62.   From the beginning, Gifford worked to promote Kreloff and BTS and to determine the suitability of Perdue's organic feedstock for BTS' anaerobic digestion technology.

63.   In June 2018, Kreloff asked Gifford to secure feedstock samples from several Perdue facilities, including the Accomac facility. Feedstock samples were important to Kreloff to determine the viability of Perdue feedstock in BTS' anaerobic digestion technology.

64.   Despite their early work, BTS had not yet paid Plaintiffs any Monthly Fees. Gifford was frustrated given the one-sided efforts. When Kreloff heard about this frustration, Kreloff

---

[2] Kreloff and Greenfield formed Bioenergy Development Group, LLC in October 2018. As evidenced by subsequent conduct, this was a breach and repudiation of the Consulting Agreement and further evidence of Kreloff's fraud.

reassured Gifford of his commitment to the mutually profitable endeavor: "as we briefly discussed last week, there are things going on that would basically <u>guarantee your success inside the contract we have</u>, and there is a lot of money to be made." June 25, 2018 email (emphasis added).

65.    Buoyed by Kreloff's reassurances and promises of performance under the Consulting Agreement, Gifford continued to promote BTS and Kreloff to Perdue.

66.    Gifford sourced and had delivered to BTS' affiliate operations in Italy the feedstock samples Kreloff requested. Gifford informed Perdue that the samples were needed for BTS to determine whether the organic waste would produce gases that could be sold to local utilities.

67.    In addition, Gifford worked to formulate how BTS' digestate would compost in the Seaford facility's current process.

68.    Kreloff specifically noted Gifford's early success. In July 2018, Kreloff commented to Gifford that he met Steve Levitsky – Perdue's Vice President of Sustainability – at a conference, noting that "'he knows about us and we'll be talking soon.' I assume that was because of you, thanks."

69.    Based on these early successes, on September 11, 2018, Kreloff sent Gifford and Jason Pease a model detailing what an acquisition of the Seaford facility would look like from a financial perspective. Gifford and Jason Pease responded with suggestions to improve the model.

70.    On September 26, 2018, Kreloff, Gifford, Jason Pease and Chuck Gifford met for breakfast in Lewes, Delaware. At that meeting Kreloff discussed the parties' partnership and stated that they were "going to do a lot of deals together." Plaintiffs continued to foster Kreloff and BTS' interests with Perdue, specifically focusing on the Seaford and Accomac facilities.

71.    On October 30, 2018, Plaintiffs arranged for an in-person meeting amongst themselves, BTS and Perdue at Perdue's Accomac facility. The parties discussed ways to improve

the Accomac facility's handling of organic waste and the emerging prospects of BTS acquiring the Seaford facility. In addition, that day Kreloff was introduced to Rick Harrell – Perdue's Regional Environmental Manager.

72.     Following the meeting, Peter Ettinger – then BTS Bioenergy, Inc.'s Director of Marketing and Sales – emailed Harrell with some follow-up inquiries. Knowing they were key to the introduction and negotiations, Ettinger copied Gifford, Jason Pease and Chuck Gifford on his email.

73.     Before, during and for some time after this October 2018 timeframe, Ettinger would use both a Gmail email account and a BTS-Biogas.com email account to conduct business as the BTS Bioenergy, Inc. Director of Marketing and Sales. Kreloff principally relied on his Gmail email account to conduct business during the same time. During this same timeframe, Kreloff and Ettinger were corresponding with Plaintiffs through their usagrisoil.com email accounts.

74.     On October 31, 2018, Kreloff, Ettinger, Gifford, Jason Pease and Chuck Gifford meet at the Seaford facility to frame out the structure of a potential transaction to acquire the facility. Kreloff then emailed Gifford, Jason Pease and Chuck Gifford the terms discussed that day. Within that structure was the explicit understanding that "we keep all gas and composting revenue."

75.     Thereafter, the parties continued to refine the terms of the proposed transaction with Perdue.

76.     On November 14, 2018, Kreloff, Ettinger and Jason Pease had lunch together in Georgetown, Delaware. During that lunch, Kreloff reiterated his partnership with Plaintiffs and that they would be "doing a lot of deals together."

77.     On November 19, 2018, Kreloff emailed Gifford and Jason Pease "Have a great holiday - I think we have a solid offering out to Perdue [for the Accomac facility]."   Gifford responded with his agreement.

78.     Thereafter, Jason Pease provided Kreloff with all the site plans and engineering drawings such that Kreloff could start work on additions to the Seaford facility to accommodate gas production operations.

79.     On December 1, 2018, Kreloff emailed Gifford the material terms for a Letter of Intent with Perdue for the purchase of the Seaford facility.  Gifford responded with changes to the offer that he believed would make the offer more attractive to Perdue.  The parties exchanged several more versions of the Seaford Letter of Intent over the next few weeks.

80.     At approximately the same time, Kreloff, Ettinger, Gifford and Jason Pease were continuing work on a Letter of Intent to be sent to Harrell for the Accomac facility.  Knowing there were other suitors, Gifford suggested that BTS insert a no-shop provision in the Accomac Letter of Intent.  The parties exchanged several different versions of the Accomac Letter of Intent over the next few weeks.

81.     In early December 2018, Jason Pease provided BTS with information addressing the waste stream analysis and the operating cost numbers for the Seaford facility.  This provided BTS with a competitive advantage versus any other potential strategic partner because BTS had the data to forecast both revenue and expenses.

82.     As the parties' efforts to finalize the Seaford Letter of Intent neared completion, Kreloff engaged the New York office of Paul, Weiss, Rifkind, Wharton & Garrison LLP to finalize the document.

83.     Gifford's daughter and Jason Pease's wife, Katie Pease, is an attorney.

84.     Kreloff thought it justified and beneficial to have Katie Pease involved in finalizing the Seaford Letter of Intent with the Paul Weiss attorneys.  Accordingly, on December 12, 2018, Kreloff emailed his Paul Weiss attorneys about Katie Pease's role in the process: "[P]lease meet Katie Pease (cc:d), who is assisting our partners US agrisoil on this document. Please see her attached markup. Please Work together to finish this ASAP."  (Emphasis added).

85.     The next day, December 13, 2018, Kreloff emailed Gifford, Jason Pease and Chuck Gifford about figures included in the Accomac Letter of Intent that was first sent to Harrell on December 9, 2018.  Specifically, Kreloff was asking for Plaintiffs' thoughts on waste figures and whether their anticipated operations could handle the volume.  Before anyone was to respond to Perdue, Kreloff wanted a "sanity check" on the proposed numbers as compared to the numbers Plaintiffs were "thinking or have."

86.     After confirming the correct waste figures, Kreloff submitted the executed Accomac Letter of Intent to Perdue on December 23, 2018.  Perdue returned a counter-executed copy on December 24, 2018.  Within minutes of receipt, Kreloff forwarded a copy to Gifford, Jason Pease and Chuck Gifford with the message "Merry Christmas!"

87.     This communication, and earlier and subsequent communications between Plaintiffs and Defendants, demonstrate that the Accomac facility project was a project that arose during the course of the parties' efforts under the Consulting Agreement.

88.     At the same time, the parties had finalized the Seaford Letter of Intent.   On December 23, 2018, Gifford submitted the executed Seaford Letter of Intent to Randy Day at Perdue.

89.     On February 6, 2019, Perdue returned the fully executed Seaford Letter of Intent to Kreloff.  Kreloff forwarded the fully executed letter of intent to Gifford, Jason Pease and Katie Pease noting "Congrats on a big first step!"

90.     This communication, and earlier and subsequent communications between Plaintiffs and Defendants, demonstrate that the Seaford facility project was a project that arose during the course of the parties' efforts under the Consulting Agreement.

**F.      Plaintiffs Continue to Foster Defendants' Interests and Kreloff Continues to Reassure Performance Consistent with the Consulting Agreement**

91.     By February 6, 2019, Plaintiffs had materially performed the services called for under the Consulting Agreement.

92.     Nonetheless, Plaintiffs continued to foster Defendants' interests with Perdue.

93.     During the spring of 2019, Kreloff would correspond with and meet with Gifford and Jason Pease to discuss work on the Seaford and Accomac projects.

94.     On March 27, 2019, Kreloff, Gifford, Jason Pease and Chuck Gifford met for dinner in Lewes, Delaware.  During that dinner, the parties discussed their future work together, with Kreloff stating that "nothing has changed" from the time they first reached agreement under the Consulting Agreement.

95.     During this time, USAG was still receiving a $50,000 monthly fee to manage the Seaford facility.  Fundamentally, but for the promises made by Kreloff of compensation under the Consulting Agreement, USAG had no economic motivation to promote Defendants' interests with Perdue.

96.     The Consulting Agreement's initial term was supposed to end on April 30, 2019. However, both Plaintiffs and Defendants operated as if the Consulting Agreement remained in effect.  To be certain, on April 30, 2019 – the day the Consulting Agreement allegedly expired –

16

Kreloff calendared a meeting between himself and Gifford for May 2, 2019 in Georgetown, Delaware to continue discussion and development of the Seaford and Accomac projects.

97.     As described herein, while the parties manifestly assented to an extension of the Consulting Agreement's term, if the Consulting Agreement is found to have expired on April 30, 2019, then Kreloff's companies violated the non-circumvention and non-solicitation provisions contained in the Consulting Agreement.

98.     During the summer of 2019, Defendants would ask Plaintiffs to obtain hatchery waste samples for analysis and for Plaintiffs to participate in environmental permitting discussions. Plaintiffs obliged all requests and worked cooperatively with Defendants.

99.     During June and July 2019, Plaintiffs and Defendants continued to work on revised tipping fee rates and projections they anticipated from Perdue at the Seaford facility.

100.     On August 27, 2019, Kreloff met with Gifford for lunch in Madison, Connecticut. During that lunch, Kreloff again reiterated that the parties were aligned and that nothing had changed.  Kreloff represented that he wanted to develop several more projects with Plaintiffs.

101.     Based on Kreloff's continued promises, Plaintiffs continued to forge ahead.  In September 2019, Gifford reached out to Harrell to inquire about Perdue's Lewiston, North Carolina facility.  Harrell provided Gifford with the organic waste information needed to assess the facility as an additional project under the Consulting Agreement.  This and other information related to Perdue's Lewiston, North Carolina facility was provided to Kreloff.

102.     In October and November 2019, Defendants worked directly with Jason Pease to refine the Asset Purchase Agreement and Feedstock Agreement being negotiated between Perdue and BDG.  BDG would ask for Jason Pease's assessment of what equipment should be purchased or whether leases were more economically advantageous.  In addition, Gifford and Jason Pease

helped BDG negotiate the tipping fee and price escalator that was to be part of the Feedstock Agreement.  Although Plaintiffs were never provided final copies of either agreement, Plaintiffs materially assisted BDG and Kreloff with the negotiation of the terms prior to execution.

**G.      Kreloff Raises Capital to Fund his Operations and the Asset Purchase Agreement with Perdue**

103.    As identified above, Kreloff's investment thesis for his companies was to "marry BTS's [BTS Biogas from Italy] proven anaerobic digestion technology with plant financing, engineering, project development, and to guarantee energy yields and plant performance. The last part of the thesis is to bring this solution to the United States and the rest of the world." *See supra*, ¶ 31.

104.    Now that Kreloff had used-up Plaintiffs' contacts and relationships to deliver both the Seaford and Accomac projects, he needed the "plant financing."

105.    Sagewind and Newlight were all too willing to provide the financing required.  Not just for the impending Asset Purchase Agreement with Perdue, but also to fund operations and to purchase the anaerobic digestion technology from BTS Biogas in Italy.

106.    Upon information and belief, Sagewind was the first to invest with Kreloff. Through its website advertising, Sagewind represents that Bioenergy Devco was a representative investment from January 2017.



http://www.sagewindcapital.com/investments/ (last visited August 19, 2020).

107.    In a subsequent press release, Defendants describe Steve Lefkowitz – Sagewind's Managing Partner – as a founding partner of Bioenergy Devco.  (Exhibit B at 2).

108.    As Plaintiffs were working with Defendants to help finalize the Asset Purchase Agreement with Perdue in the middle of 2019, Kreloff was busy raising additional capital.

109.    As disclosed in a press release dated August 8, 2019, "Bioenergy DevCo . . . announced today that it has received its first institutional investment of $106 Million from Newlight Partner LP."  (Exhibit B at 1).  Defendants suggested that "Bioenergy DevCo intends to use this substantial new growth capital to expand its operational footprint in North America."  (*Id.*).

110.    Upon information and belief, Sagewind and Newlight both knew of the Consulting Agreement and the Developer and Tipping Fees owed Plaintiffs thereunder.

111.    Sagewind would not maintain its investment with, and Newlight would not undertake an investment in, Kreloff's companies with Plaintiffs' revenue override still in the equation.

112.    Sagewind and Newlight interfered with Plaintiffs' rights under the Consulting Agreement and abetted Kreloff's companies' breaches of the Consulting Agreement and his fraudulent conduct.

113.    A part of the Newlight capital raise went to acquire BTS Biogas (Italy).  In a press release dated August 9, 2019, "Bioenergy DevCo . . . announced [] that it has acquired BTS Biogas, which will operate as an affiliate and enable new operation and expansion of anaerobic digestion in North America."  (Exhibit C at 1).

**H.**    **Defendants Reach an Asset Purchase Agreement with Perdue**

114.    On November 15, 2019, Defendants (purportedly through BDG) executed a definitive Asset Purchase Agreement with Perdue related to the Seaford facility (the "APA"). Additionally, upon information and belief, one of the Defendants executed a feedstock agreement with Perdue (the "Feedstock Agreement").

115.    Upon information and belief, the purchase price under the APA was the figure Gifford had first identified for Kreloff in December 2018.

116.    As part of the Feedstock Agreement, BDG or its affiliates are guaranteed delivery of organic waste from Perdue.  Upon information and belief, the price per ton of waste increases over time and is guaranteed for twenty (20) years.

117.    Consistent with just the Tipping Fee compensation owed under the Consulting Agreement, Plaintiffs' share of the presently permitted waste stream from just the Seaford facility is valued at more than $4.2 million at present value.  This figure does not include revenue that may be generated from the Accomac or Lewiston facilities or any of the other Perdue facilities Defendants might develop in the future.

118.    In addition, this figure does not include the revenue arising from gas generation derived from the waste streams or the Developer Fee for capital expenditures.

119.    BDG assumed operational control of the Seaford facility in February 2020.

120.    Thereafter, Perdue stopped paying USAG its $50,000 monthly fee to manage the Seaford facility.

121.    Following the consummation of the APA and after assuming control of the Seaford facility, Kreloff stopped corresponding with Plaintiffs.

122.    Other than the $6,000 Monthly Fee that was only paid to Plaintiffs for a few months, Defendants failed and refused to compensate Plaintiffs for their work under the Consulting Agreement.

123.    Kreloff's repeated reassurances that he and his companies were committed to working together and that "nothing has changed" were all false.

## I.    **Defendants' Nefarious Conduct**

124.    On February 17, 2020, Gifford emailed Kreloff asking that the Developer Fee be paid and that the Tipping Fee be paid on a periodic basis following Perdue's delivery of the waste streams.

125.    Kreloff never responded to his partner of almost two (2) years.

126.    Instead, Plaintiffs had to wait almost two (2) months before receiving a letter from Kreloff's litigation attorney.

127.    Undeterred by the facts and the parties' working relationship for two (2) years, Kreloff's litigation attorney posited that BTS ceased operating in May 2019 shortly after the Consulting Agreement expired and that, for at least this reason, Plaintiffs were not owed any more money for their efforts.

128.    Upon further inquiry at that time, Plaintiffs learned that as soon as Defendants thought they were clear of contractual responsibility (albeit incorrectly), Kreloff had his business attorney Greenfield cancel BTS' registration on May 3, 2019 (date received by the Maryland Secretary of State, but mailed earlier) – a mere three days after the initial expiration date identified in the Consulting Agreement.

129.    Despite having at their disposal at least two existing corporate entities to execute the Consulting Agreement (*e.g.*, Gotham or BTS Biogas), Defendants – assisted by their business attorney Greenfield – purposefully chose to create and use BTS as a shell contracting party for the Consulting Agreement.

130.    These facts are evidence of many things, including: (i) BTS' status as a sham company that was never capitalized or operated separately from Kreloff, and (ii) Kreloff's premeditated effort to defraud Plaintiffs.

131.    Defendants' formation of BDG and Bioenergy Devco in October 2018 for the purposes of carrying out Kreloff's business, while maintaining BTS as a shell, was a repudiation of Defendants' obligations under the Consulting Agreement.

## Causes of Action

### Count One – Breach of Contract/Breach of the Implied Covenant of Good Faith and Fair Dealing (Against BTS, BDG and Bioenergy Devco)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

132.    The Consulting Agreement is a valid and enforceable contract.

133.    EDG fully performed under the Consulting Agreement.

134.    As identified above, BTS, BDG and Bioenergy Devco breached and repudiated the Consulting Agreement.

135.   If not a breach of the Consulting Agreement's express provisions, BTS, BDG and Bioenergy Devco breached the implied covenant of good faith and fair dealing.

136.   Defendants' breaches caused Plaintiffs damages in an amount to be determined at trial.


## Count Two – Promissory Estoppel
### (Against Kreloff, BTS, BDG and Bioenergy Devco)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

137.   As identified above, Kreloff made clear and definite promises, both verbally and in writing, that he and his companies would continue to partner with Plaintiffs and that everything remained the same – both before and after April 30, 2018.

138.   Kreloff reasonably expected that his assurances and promises would induce Plaintiffs' actions or forbear from withholding further action.

139.   Plaintiffs acted in reliance on Kreloff's promises.

140.   Should Plaintiffs be unable to enforce their contractual rights against Kreloff's companies, Plaintiffs would suffer a detriment that could only be avoided by the enforcement of Kreloff's promises.


## Count Three – Unjust Enrichment
### (Against all Defendants)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

141.   As identified above, Plaintiffs conferred benefits upon Defendants by introducing them to Perdue and using their industry knowledge to deliver several profitable opportunities that Defendants would not otherwise have obtained.

142.     As identified above, Defendants acknowledged the benefits Plaintiffs brought to them both expressly and through the consummation of business opportunities that will deliver revenue well into the future.

143.     As identified above, Defendants have accepted and retained the fruits of Plaintiffs' labor without payment of the fair value for those efforts.

144.     Defendants' breaches caused Plaintiffs damages in an amount to be determined at trial.

### Count Four – Tortious Interference
### (Against BTS Biogas, Sagewind and Newlight)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

145.     The Consulting Agreement is a valid and enforceable contract.

146.     Defendants BTS Biogas, Sagewind and Newlight knew of the Consulting Agreement and the fees payable thereunder.

147.     As identified above, Defendants BTS Biogas, Sagewind and Newlight interfered with EDG's rights under the Consulting Agreement.

148.     As identified above, Defendants BTS, BDG and Bioenergy Devco breached the Consulting Agreement.

149.     Defendants BTS Biogas, Sagewind and Newlight's improper conduct caused Plaintiffs damages in an amount to be determined at trial.

### Count Five – Fraud
### (Against Kreloff)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

150.    As identified above, Kreloff made misrepresentations of fact to Plaintiffs and employed an artifice to defraud Plaintiffs through his corporate shell game.

151.    Kreloff knew his representations and corporate shell game to be false or fraudulent when undertaken or he undertook his conduct with reckless indifference.

152.    Kreloff made his misrepresentations and employed his corporate shell game for the purpose of defrauding Plaintiffs.

153.    Plaintiffs justifiably relied upon Kreloff's representations and corporate structuring.

154.    Kreloff's fraudulent conduct caused Plaintiffs damages in an amount to be determined at trial, including punitive damages.

155.    BTS' separate corporate identity should be disregarded/pierced and Kreloff (and any additional BTS members) held liable for the damages attributable to BTS.


Count Six – Aiding and Abetting
(Against BTS, BDG, Bioenergy Devco, BTS Biogas, Sagewind and Newlight)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

156.    As identified above, Kreloff engaged in fraud.

157.    Defendants BTS, BDG, Bioenergy Devco, BTS Biogas, Sagewind and Newlight knew of Kreloff's fraudulent representations and corporate shell game.

158.    As identified above, Defendants BTS, BDG, Bioenergy Devco, BTS Biogas, Sagewind and Newlight knowingly participated in Kreloff's fraudulent conduct and provided him substantial assistance.

159.    Defendants BTS, BDG, Bioenergy Devco, BTS Biogas, Sagewind and Newlight's improper conduct caused Plaintiffs damages in an amount to be determined at trial.

Count Seven – Civil Conspiracy
(Against all Defendants)

Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

160.    All Defendants conspired with one another to withhold from Plaintiffs the benefits they earned for their work.

161.    As identified above, Defendants defrauded Plaintiffs and interfered with Plaintiffs' rights under the Consulting Agreement in an effort to further their joint interests.

162.    Defendants' improper conduct caused Plaintiffs damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs U.S. Agrisoil, LLC and The Environmental Developers Group, LLC respectfully request that judgment be entered in their favor and against Defendants BTS Bioenergy, LLC, Bioenergy Development Group, LLC, Bioenergy Devco, LLC, BTS Biogas, LLC, Newlight Partners LP and Sagewind Capital LLC as follows:

A.    An award of compensatory damages in an amount to be determined at trial;

B.    A decree that BTS' separate legal identity is disregarded/pierced and that Kreloff (and any additional BTS members later identified) be held liable for all damages attributable to BTS;

C.    A constructive trust over any future development of Perdue projects by Defendants, including the Accomac and Lewiston facilities;

D.    An accounting of all revenues received and capital expenditures undertaken to date and those reasonably expected to be received or undertaken in the future;

E.    An award of punitive damages;

F.    An award of pre- and post-judgment interest at the legal rate;

26

G.   An award of attorneys' fees as permitted under the Consulting Agreement or common law;

H.   An award of costs and expenses; and

I.   An award of such other and further relief as the Court deems just and proper.

Dated:  August 25, 2020

/s/ Sallie E. Gilbert
Cary Joshi (MD Bar #: 1806070002)
Sallie E. Gilbert (MD Bar #: 1806190061)
Bailey & Glasser, LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
  *Attorneys for Plaintiffs*