# EXHIBIT A

# CONSULTING AGREEMENT

This Agreement ("Agreement") is entered into as of _May 1,_____, 2018 by and between BTS Bioenergy, LLC ("Company) and Environmental Developers Group, LLC ("Contractor"), collectively referred to as "Parties."

This Agreement is intended to describe certain services to be performed by Contractor for Company. In consideration for the promises and mutual covenants set forth below, the parties agree as follows:

1. Engagement and Services: Contractor agrees to provide services to Company ("Services") as described in the attached Exhibit A.

    (a) Engagement. The Company hereby engages the Contractor to provide and perform the services set forth in Exhibit A attached hereto (the "Services"), and the Contractor hereby accepts the engagement.

    (b) Standard of Services. Contractor will exclusively control and direct the manner and means of performing these Services and will be solely responsible for completing these Services. The Services shall be completed to Company's satisfaction and are subject to Company's approval. Contractor [and its employees] will perform all Services required under this Agreement in compliance with all applicable federal, state or local laws, regulations, and policies established by Company, and in accordance with generally recognized practices, standards and procedures. All Services to be provided by Contractor shall be performed with promptness and diligence in a workmanlike manner and at a level of proficiency to be expected of a consultant with the background and experience that Contractor has represented. The Company shall provide such access to its information, property and personnel as may be reasonably required in order to permit the Contractor to perform the Services.

    (c) Exclusivity. Contractor will serve as Company's exclusive business development provider for Perdue Farms within the United States and all other poultry companies located on the Delmarva Peninsula for engineering, technology, construction, maintenance and other related services. Company will serve as Contractor's sole provider for anaerobic digestion for Perdue Farms and for all poultry companies located in the Delmarva Peninsula.

(d) <u>Tools, Instruments and Equipment</u>. If appropriate, Contractor shall provide Contractor's own tools, instruments and equipment and place of performing the Services, unless otherwise agreed between the Parties.

(e) <u>Representation and Warranty</u>. The Parties represent and warrant that neither is under any contractual or other restrictions or obligations which are inconsistent with the execution of this Agreement or which will interfere with the performance of the Services.

2. <u>Hours of work</u>: Contractor agrees to put in the number of hours that are reasonably necessary to complete the Services and otherwise fulfill the spirit and purpose of this Agreement. Contractor agrees that all Services will be performed promptly and diligently in accordance with generally recognized practices and standards.

3. <u>Work Product:</u> Contractor agrees that all work product, whether intellectual or real property, including but not limited to, documents, charts, drawings, reports, manuscripts and inventions, developed or prepared for Company by Contractor under the terms of this Agreement shall belong exclusively to Company and shall constitute "works made for hire." Company shall be the sole owner of all copyright and other proprietary rights (both tangible and intangible), title, and interest therein. If any work product produced or provided by Contractor cannot be considered "works made for hire," Contractor hereby assigns to Company the ownership of rights including, but not limited to, copyrights, registrations and similar protections which may be valuable. Contractor hereby also agrees to sign any additional documents and to perform any other acts a Company may deem necessary to secure for Company or its designees the rights herein assigned.

4. <u>Best Efforts:</u> Contractor will ensure that all employees performing Services under this Agreement will do so to the best of their abilities, experience and talents, to the reasonable satisfaction of Company. Contractor will inform Company of any event or circumstance which renders Contractor unable to perform or complete any aspect of the Services.

5. <u>Period of Performance:</u> The terms of this Agreement shall commence on May 1, 2018 and terminate on April 30, 2019, unless earlier terminated as described below. The Parties may agree to extend this Agreement in writing for up to two (2) additional one (1) year terms.

6. <u>Payment:</u>

2

(a) Monthly Fee: From May 2018 through October 2018, Company will pay Contractor a monthly fee of six thousand dollars ($6,000). Unless the Parties agree in writing otherwise, beginning December 2018 and for the remainder of the Agreement, no monthly fee will be paid by Company to Contractor.

(b) Developer Fee: Company will pay Contractor two percent (2%) of Company's expended capital costs for projects it constructs on property secured from Contractor and provided by Perdue Farms in the United States or another poultry company on the Delmarva Peninsula. This provision survives termination of the Agreement if the Parties agree in writing that Contractor's efforts during the course of the Agreement resulted in a given project. If property is not secured by these companies, then Company is under no obligation to provide a developer's fee to Contractor.

(c) Tipping Fee: Company will pay Contractor two dollars ($2) per ton for every ton of organic waste collected and delivered by Perdue Farms in the United States or all other poultry companies located on the Delmarva Peninsula to Company's facilities. In addition, based upon a standard tipping fee of fifty five dollars ($55) per ton, Company will pay Contractor twenty five percent (25%) of any tipping fee it can secure over and above the standard tipping fee of fifty five dollars ($55) per ton. This provision survives termination of the Agreement if the Parties agree in writing that Contractor's efforts during the course of the Agreement resulted in a given project.

7. Termination: Contractor agrees that, in the event of any violation by Contractor of any of the terms of this Agreement, or the inability or failure of Contractor, in Company's opinion, to provide or complete the Services, Company may terminate Contractor's engagement immediately and without notice. In this event, Contractor is only entitled to pro-rated compensation for services rendered and work completed up until the date of termination, and Company will have no other obligations or liabilities to Contractor, financial or otherwise.

8. Representations and Indemnifications:
    (a) Contractor is an independent contractor with respect to Company. Contractor shall not have, nor represent him/her/itself as having, the right or authority to enter into any agreement or to make any promise of any nature whatsoever on behalf of or in the name of Company, without Company's consent.

(b) As an independent contractor, Contractor shall not have the status of an employee of Company. Accordingly, Contractor shall not be eligible to participate in any employee benefit or group insurance plans or programs maintained by Company, and Company shall not provide social security, unemployment compensation, disability insurance, worker's compensation or similar coverage, nor any other statutory benefit to Contractor. Contractor shall assume full responsibility and liability for making and/or paying any and all federal, state, and/or municipal taxes, assessments, social security benefits and/or other deductions as required by law on behalf of itself.

(c) Each Party certifies that this Agreement will not violate the terms of any other contract or interfere with any other obligation binding upon either Party. Each Party shall have the right to perform services for others during the term of this Agreement, provided that such performance does not in any way interfere or conflict with the performance of the Services hereunder.

(d) Each Party shall defend indemnify and hold harmless the other Party, including Affiliates and each of their respective officers, directors, shareholders, employees, representatives, agents, successors and assigns from and against all Claims of Third Parties, and all associated Losses, to the extent arising out of (i) a Party's gross negligence or willful misconduct in performing any of its obligations under this Agreement, or (ii) a material breach by a Party of any of its representations, warranties, covenants or agreements under this Agreement.

9. <u>Confidentiality and Safeguarding of Information.</u> Neither Party shall disclose the other Party's Confidential Information to any person other than its employees, officers, directors, affiliates, agents and representatives who are bound by obligations of confidentiality and who have a need to know such information in order to perform their obligations in connection with the Research. Each Party may only use the other Party's Confidential Information as permitted to perform its respective obligations under this Agreement. "Confidential Information" means any information disclosed by a Party to the other Party that is reasonably expected to be treated in a confidential manner under the circumstances of disclosure under this Agreement or by the nature of the information itself.

10. <u>Non-disparagement</u>. Neither Party shall make any statement, written or oral, that disparages the other Party, its business or any of its officers, directors, employees, attorneys, agents, and representatives, including, without limitation, any communication which would cause or tend to cause the recipient of the

communication to question the business condition, integrity, competence, good character or product quality of the person or entity to which the communication relates.

11. Non-circumvention. The Parties agree that their business involves, among other activities, introducing, participating, effectuating and consummating transactions between their respective contacts, including other Parties and Affiliates (each, a "Transaction"). In consideration of the foregoing, each undersigned Party hereby irrevocably agrees and warrants that it and its Affiliates shall not, directly or indirectly, interfere with, circumvent, attempt to circumvent, avoid or bypass any Party from any Transactions between the Parties' contacts, or obviate or interfere with the relationship of any Party and its contacts for the purpose of gaining any benefit, whether such benefit is monetary or otherwise. The Parties also undertake not to make use of any third party to circumvent this paragraph.

12. Non-solicitation. The Parties agree that during the term of this Agreement and for twelve (12) months after the termination thereof, regardless of the reason for the termination, neither Party will directly or indirectly, solicit or attempt to solicit any business from any of the other Party's Customers, Customer Prospects, or Vendors with whom either Party had Material Contact during the term of this Agreement.

13. Successors and Assigns. The provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors and assigns, whether or not any such person shall have become a Party to this Agreement and have agreed in writing to join herein and be bound by the terms and conditions hereof. This Agreement may not be assigned by the Contractor without the prior written consent of the Company; except that the Contractor shall have the right to assign this Agreement to any entity which is controlled by the Contractor and provided, further, that the Contractor shall be the sole Party responsible for providing the Services hereunder.

14. Governing Law: This Agreement and any disputes arising therefrom shall be governed by the laws of the State of Maryland and Contractor agrees to submit to the jurisdiction of the courts of the State of Maryland for any claims arising under this Agreement.

15. Miscellaneous:
   (a) This Agreement embodies the entire understanding between the parties with respect to the transactions contemplated herein, and all prior agreements, understandings and

representations, whether oral or written, are merged into this Agreement. This Agreement may not be altered, amended, modified or otherwise changed in any way except by a writing signed by all the parties to this Agreement.

(b) No delay or omission on the part of a party to this Agreement in exercising any right hereunder shall operate as a waiver thereof or of any other right

(c) Should any provision of this Agreement be held invalid or illegal, such illegality shall not invalidate the whole of the Agreement, but rather, the Agreement shall be construed as if it did not contain the illegal part and the rights and obligations of the parties shall be construed and enforced accordingly.

(d) The section titles in this Agreement are for convenience and should not be considered in construing the Agreement.

This Agreement is entered into by the undersigned parties freely and voluntarily. Each party warrants that the person signing below is authorized to sign this Agreement on behalf of such party and to bind such party to the terms of the Agreement. This Agreement shall be binding on the Parties upon the execution of the Agreement.

_____  
Contractor Signature  
Charles H. Gifford Sr  
Contractor Printed Name  
CEO  
Contractor Title  
MAY 31, 2018  
Date  

_____  
Company Authorized Signature  
Shawn Kreloff  
Company Representative Printed Name  
CEO  
Company Representative Title  
5/31/18  
Date  

6

EXHIBIT A

## DESCRIPTION OF SERVICES

Contractor's Services will include:

- Securing property and agreements for Company's anaerobic digesters at Perdue Farms within the United States and all poultry companies on the Delmarva Peninsula.
- Coordinating and managing the partnership between Company and said companies as required.
- Obtaining waste stream from Perdue Farms within the United States and all poultry companies on the Delmarva Peninsula to be delivered to Company's anaerobic digesters.

In furtherance of these services, Contractor will provide a bi-weekly report or conduct a weekly summary telephone call on its efforts and activities to and with Shawn Kreloff, CEO of BTS Bioenergy, LLC and Peter Ettinger, Director of Marketing & Sales, BTS Bioenergy, LLC.